7/87) Affidavit for Search Warrant

# United States District Court
## DISTRICT OF DELAWARE

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

███████████████, Dover, Delaware; ███████████████ Harrington, Delaware; ██████ Camelot Meadows Mobile Home Park, Rehoboth Beach, Delaware; Teragwens Leather Toys and Lace, 1044 S. DuPont Highway, Dover, DE; Dragon's Lair, 106 Midway Village, Rehoboth Beach, Delaware

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

CASE NUMBER: 05- 41 M

**REDACTED**

I, __Darren Short__, being duly sworn depose and say:  I am a __Detective, DSP Special Investigations,__ and have reason to believe that _____ on the person of or __x__ on the property or premises known as (name, description and/or location)

███████████████, Dover, Delaware; ███████████████ Harrington, Delaware; ██████ Camelot Meadows Mobile Home Park, Rehoboth Beach, Delaware; Teragwens Leather Toys and Lace, 1044 S. DuPont Highway, Dover, DE; and Dragon's Lair, 106 Midway Village, Rehoboth Beach, Delaware

in the _____ District of __Delaware_____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachments B, which are incorporated herein by reference,

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rule of Criminal Procedure)

property that constitutes evidence of the commission of a criminal offense, the fruits of crime and things criminally possessed and property designed and intended for use and which has been used as a means of committing a criminal offense.

The facts to support a finding of Probable Cause are as follows:

See attached affidavit of Det. Darren Short, which is incorporated herein by reference.
Continued on the attached sheets and made a part hereof.    __X__ Yes    ___ No

_____
Signature of Affiant
Detective Darren Short

Sworn to before me, and subscribed in my presence
__March 15, 2005_____    at    __Wilmington, Delaware_____
Date                                                                          City and State
Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware_____    _____
Name and Title of Judicial Officer                    Signature of Judicial Officer

1. Your Affiant is Detective Darren Short with the Delaware State Police Special Investigations Unit. Affiant Short has been employed with the Delaware State Police since November 13, 1993 and is currently assigned to the Special Investigations Unit. Affiant Short holds a Bachelor's Degree in accounting from Moravian College and has completed state and federal courses about identifying, abusing, manufacturing and distributing narcotic and non-narcotic controlled dangerous substances. Affiant Short's training includes a two-week basic drug investigator's school sponsored by the U.S. Department of Justice's Drug Enforcement Administration. Affiant Short has been an affiant or co-affiant in 95 search warrants in dangerous drug investigations. Affiant Short has essentially worked full time on dangerous drug cases for the last 6 ½ years.

2. <u>Overview of this Affidavit</u>: There is probable cause to believe that there is a long-running conspiracy to distribute marijuana, involving Robert Cooke as a supplier to Gwennette Bowman, and Gwennette Bowman as a supplier to Jason Esham. There is probable cause to search the homes of these three individuals for evidence of the conspiracy. There is probable cause to seize for forfeiture three vehicles that have been observed to be used as a part of the conspiracy, and which have facilitated the distribution of marijuana. There are two businesses of which Gwennette Bowman's husband (Kenneth Bowman) is at least a part-owner, which businesses offer for sale drug paraphernalia. There is probable cause to believe that drug paraphernalia and evidence relating to the ownership and operation of the businesses will be found at the businesses.

3. During the last two weeks of August 2003, a past proven reliable cooperating individual, hereafter referred to as CI1, contacted Detective Snyder of the Special Investigations Unit. CI1 advised that CI1 has known Kenneth and Gwennette Bowman to have indoor marijuana operations at their residences. CI1 advised that Jason Esham is Gwennette Bowman's son and Kenneth Bowman's stepson and they are all involved in the illegal distribution of marijuana in the Rehoboth Beach area.

4. During the last two weeks of August 2003, CI1 performed a controlled purchase[1] of a small quantity of marijuana from Jason Esham in his residence at ▓▓▓▓▓ Camelot Mobile Home Park in Rehoboth Beach. While in the residence, CI1 observed several firearms in the living room area. The marijuana was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

5. During the month of August 2003, a concerned citizen, hereafter referred to as CC1, contacted Affiant Short. CC1 advised that Gwennette and Kenneth Bowman are involved in the illegal distribution of large quantities of marijuana. CC1 advised that the Bowmans use their businesses as fronts for their illegal activity. CC1 advised that the businesses of Teragwens Leather and Lace and Little E Creations are used. CC1 further advised that the businesses are sometimes used for distribution of the marijuana.

6. During the last two weeks of August 2003, Affiant Short contacted David Smith of the Delaware Division of Revenue. Affiant Short was advised that Gwennette Bowman has business licenses for Teragwens Leather, Toys, and Lace, Fast N Furious Auto Parts, and Little E. Creations.

7. During the first two weeks September 2003, CI1 performed a controlled purchase of a small quantity of marijuana from Jason Esham in his residence at ▓▓▓▓▓ Camelot Mobile Home Park in Rehoboth Beach. CI1 advised that Jason Esham was keeping the marijuana in a wooden box in the living room area. The marijuana was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

8. During the first two weeks of October 2003, CI1 performed a controlled purchase of a small quantity of marijuana from Jason Esham in his residence at ▓▓▓▓▓ Camelot Mobile Home Park in Rehoboth Beach. The marijuana was field-tested

---

[1] When I use the term "controlled purchase," as I do here and in ¶¶ 7, 8, 9, 11, 12, 15, 17, 18, and 28, I refer to a drug purchase made by an individual cooperating with the police, under the following procedures: a. Surveillance is initiated on the cooperating individual, and a thorough briefing is presented to surveillance officers; b. A search is conducted of the cooperating individual for contraband and/or currency, prior to sending them to make the controlled purchase; c. The cooperating individual is given official funds and the serial numbers of the currency are recorded; d. The cooperating individual is briefed as to what to do and say during the transaction and where to meet following the transaction; e. The surveillance officers are advised of the cooperating individual's appearance; f. There is an arranged pick up or meeting of the cooperating individual following the transaction; g. The cooperating individual is searched after the transaction for contraband, money and/or drugs, and any evidence obtained is secured and taken into police custody; and h. The police take a statement from the cooperating individual about the transaction, with emphasis on details that occurred while the investigating officer was out of sight and/or hearing.

with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

9. During the last two weeks of December 2003, CI1 performed a controlled purchase of a small quantity of marijuana from Jason Esham in his residence at ███████ Camelot Mobile Home Park in Rehoboth Beach. The marijuana was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

10. During the last two weeks of December 2003, CI1 observed Gwennette Bowman and Jennifer Esham dropping off large quantities of marijuana to Jason Esham at his residence at ███████ in Camelot Mobile Home Park. Gwennette Bowman was operating her 2003 Jeep Cherokee grey in color Delaware registration 27251. Gwennette Bowman sold a quantity of marijuana to another subject in the residence. CI1 advised that Gwennette and Kenneth Bowman supply Jason Esham with the marijuana he sells.

11. During the last two weeks of January 2004, CI1 performed a controlled purchase of a small quantity of marijuana from Jason Esham in his residence at ███████ Camelot Mobile Home Park in Rehoboth Beach. At the time of the purchase, Jennifer Esham was present in the living room area of the residence. CI1 purchased one bag of marijuana and there were several other bags of marijuana on the table packaged for sale. The marijuana was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

12. During the last two weeks of March 2004, CI1 performed a controlled purchase of a small quantity of marijuana from Jason Esham in his residence at ███████ Camelot Mobile Home Park in Rehoboth Beach. Jason Esham recovered the marijuana from the kitchen area of the residence and sold it to CI1. CI1 advised that there was a bag containing approximately a half-pound of marijuana and several individual plastic bags containing marijuana on the table. The marijuana was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

13. During the first two weeks of June 2004, CI1 contacted Jason Esham via telephone. Jason Esham advised CI1 that he was out of marijuana and was waiting for his mother (Gwennette Bowman) to bring him some more to sell.

14. During the first two weeks of December 2004, Detective Snyder was again contacted by CI1. CI1 advised that Jason Esham contacted him. Jason Esham advised CI1 that he was again selling marijuana. Jason Esham told CI1 that he had stopped selling marijuana for a period of time because his mother (Gwennette Bowman) had stopped selling. Jason Esham told CI1 that he was supplied his marijuana by Gwennette Bowman and since she was again selling marijuana, he could get CI1 anything he wanted.

Case 1:05-mj-00041-MPT   Document 10   Filed 04/14/2005   Page 5 of 17

15. During the last week of December 2004 and the first week of January 2005, Detective Snyder was contacted by CI1. CI1 advised that CI1 was at Jason Esham's residence in Camelot Mobile Home Park in Rehoboth Beach. CI1 advised that CI1 observed Gwennette Bowman in possession of approximately ten pounds of marijuana. CI1 heard Gwennette Bowman talking about having to drop the marijuana off to "some people." Gwennette Bowman was operating a Jeep Cherokee Delaware registration 27251. Also at the residence was Jennifer Esham operating a 1997 Dodge pickup Delaware registration C101706. CI1 observed Jennifer Esham give Gwennette Bowman money in the residence.

16. During the last two weeks of February 2005, a cooperating individual, hereafter referred to as CI2, contacted Affiant Short. CI2 does not have a history as an informant, and therefore I have tried to tape record everything that CI2 does. My experience with CI2 to date is that CI2 has been accurate in CI2's descriptions, and I therefore believe that CI2 is reliable. CI2 advised that CI2 has been associated with Gwennette Bowman for several years and has purchased marijuana from her on several occasions since meeting Gwennette Bowman. CI2 advised that CI2 met Kenneth and Gwennette Bowman in Ken's Underground while getting a Tattoo. CI2 advised that during the meet they discussed marijuana, which lead to subsequent purchases of marijuana from Gwennette Bowman. CI2 has met with Gwennette Bowman at Teragwen's Leather, Toys, and Lace on South Dupont Highway to set up marijuana purchases. CI2 advised that CI2 has purchased marijuana from the Bowmans' residence at ███████████, Felton, Delaware. CI2 advised that Gwennette Bowman also has delivered the marijuana to CI2 in her 2003 Grey Jeep Grand Cherokee. CI2 further advised that Kenneth and Gwennette Bowman use Ken's Underground and Teragwen's Leather, Toys, and Lace as fronts for their illegal activity. CI2 further advised that the Bowmans have recently taken over Capitol Pizza pizza shop in Dover. CI2 took Affiant Short to the residence on Paradise Alley Road and pointed out the Bowmans' residence.

17. During the last two weeks of February 2005, Affiant Short was again contacted by CI2. CI2 advised that CI2 could purchase marijuana from Gwennette Bowman at her residence at ███████████, Harrington, Delaware. Surveillance was established on the residence and a 2000 Pontiac Grand Am was observed in the driveway of the residence. The vehicle was Delaware registration 441163. The vehicle is registered to Gwennette Bowman and was operated by Jason Esham. The vehicle left the residence and went to Jason Esham's residence at ███████████ Camelot Mobile Home Park, Rehoboth Beach, Delaware. CI2 performed a controlled purchase of a quantity of marijuana from Gwennette Bowman inside her residence at ███████████ During the purchase, Gwennette Bowman advised CI2 that she had supplied her son (Jason Esham) with a quantity of marijuana while he was at the residence. The marijuana CI2 purchased was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

18. During the last two weeks of February 2005, Affiant Short was again contacted by CI2. CI2 advised that CI2 could purchase a quantity of marijuana from Gwennette Bowman at her residence at ▮▮▮▮▮▮▮▮▮▮, Harrington, Delaware. CI2 entered the residence and contacted Gwennette and Kenneth Bowman in the residence. CI2 was sold a quantity of marijuana in the residence by Gwennette Bowman in exchange for U.S. Currency. During the transaction CI2 spoke with the Bowmans about meeting their supplier of marijuana. Gwennette Bowman stated that her supplier was looking for someone to buy large quantities of marijuana from locally. Gwennette Bowman agreed to set up a meeting at her residence on February 25, 2005 so that CI2 could meet Robert Cooke. This conversation was audio recorded. The marijuana CI2 purchased was field-tested with a #9 KN Reagent for Marijuana, Hashish, and THC and a positive reaction was obtained.

19. On February 25, 2005, CI2 met with Gwennette Bowman and Robert Cooke at ▮▮▮▮▮▮▮▮▮▮ Harrington, Delaware. Parts of the conversation were recorded and parts were not due to technical difficulties with the audio system. CI2 advised me of what was said between Gwennette Bowman, Robert Cooke and CI2. Robert Cooke was followed from BCP (a car dealership) Smyrna to his residence at ▮▮▮▮▮▮▮▮▮▮ Dover, Delaware and then to the meeting at Paradise Alley Road. Robert Cooke was operating his 2004 Jeep Cherokee Delaware registration PC305313.

20. During the meet on February 25, 2005, Gwennette Bowman advised that Robert Cooke was her partner in Teragwen's and that he had put $20,000 into the business. The name Teragwen is a combination of Robert Cooke's wife name Terri and Gwennette's name. Gwennette further stated that Kenneth Bowman is a partner with Jennifer Layfield in the Dragon's Lair in Rehoboth Beach and that Kenneth Bowman sold Layfield 49% of the business and that he still is 51% owner of the business. Gwennette Bowman advised that Jennifer Layfield gives them $5000 a month as their share of the business from Dragon's Lair. Gwennette Bowman further advised that her name is on Ken's Underground.

21. During the meet on February 25, 2005, Robert Cooke advised that he sells approximately 14-30 pounds of marijuana a month and has been in the marijuana business for a long time dealing with a tight clientele. He advised that his partner was on his way to Connecticut to pick up twenty pounds of marijuana. He further advised that he is presently paying $1800-$1900 a pound. Robert Cooke advised that he would purchase marijuana from CI2 in bulk at $2000 a pound. Robert Cooke advised that he could purchase all 30 pounds in a 42-day growing cycle from CI2.

22. Also during the meet on February 25, 2005, Robert Cooke agreed to sell CI2 a half-pound of marijuana to hold CI2 over until CI2's crop was harvested. Robert Cooke stated that he would sell the marijuana to CI2 in the parking lot of the BCP car dealership in Smyrna. Robert Cooke gave CI2 his business card with his phone

numbers on it. (Cell phone 302-423-3725). Gwennette Bowman drew a map on the back of the card to show CI2 where to park to do the transaction. Robert Cooke told CI2 that the location on the south end of the dealership is a safe location out of view of all the dealerships surveillance cameras. Gwennette Bowman vouched for CI2's marijuana and for CI2's credibility.

23. After CI2 had left the residence, Gwennette Bowman called CI2 and told CI2 that Robert Cooke was excited about dealing with CI2. Gwennette Bowman advised that she gave Robert Cooke a handgun after CI2 had left the residence.

24. On March 1, 2005, Affiant Short met with CI2. Affiant Short instructed CI2 to call Robert Cooke in reference to setting up a marijuana transaction for March 2, 2005. CI2 contacted Robert Cooke and set up the transaction for the next day. This conversation was audio taped.

25. On March 1, 2005, Affiant Short performed an inquiry into Kent County Property Tax information. The inquiry revealed that Robert Cooke owns a residence at ▮▮▮▮▮▮▮▮▮▮ Dover, Delaware. The inquiry also revealed that Gwennette Bowman owns the residence at ▮▮▮▮▮▮▮▮▮▮ Harrington, Delaware.

26. On March 2, 2005, Affiant Short again met with CI2. CI2 and CI2's vehicle were searched and found to be free of drugs, money, and contraband. Affiant Short instructed CI2 to place a phone call to Robert Cooke to advise him that CI2 was close to the meet location. CI2 placed the phone call and Affiant Short audiotaped the conversation. Robert Cooke advised CI2 that he was at the car dealership and that he would meet CI2 on the south side of the dealership or inside. Affiant Short then supplied CI2 with thirteen hundred dollars U.S. currency and set up equipment to audio record the transaction. Detective Calloway set up to video and audio record the transaction at the dealership. Affiant Short then followed CI2 to the car dealership and observed CI2 pull in next to Robert Cooke's Jeep Cherokee Delaware registration PC305313 that was parked on the south side of the dealership. CI2 met with Robert Cooke. Detective Calloway saw (and I have seen on the videotape) Robert Cooke remove a brown package from the passenger side of his vehicle and then get into the passenger side of CI2's vehicle. While it could not be seen, it could be heard that Robert Cooke then handed CI2 a quantity of marijuana and CI2 handed Robert Cooke the U.S. currency that I had supplied CI2.

27. They then had a conversation about Robert Cooke purchasing marijuana from CI2 in two weeks. Robert Cooke advised CI2 that he had already advised his clients who buy in bulk that he was trying a higher grade of marijuana and as a result his prices may have to be adjusted. Robert Cooke advised that he is safe selling out of the car dealership because they "own Smyrna Police Department." He further advised that they fix Smyrna Police Department cars and buy them dogs, so they do not bother them. Also during this conversation, Robert Cooke advised CI2 that he had a partner in his marijuana distribution and that his partner was a black male who mainly sells

to lawyers and people in the music industry. Robert Cooke also discussed concealment methods for transporting large quantities of marijuana. Robert Cooke advised that he would be interested in buying 25-30 pounds of marijuana every 43-day cycle because that was about his normal flow. Robert Cooke told CI2 that he wanted as close to ten pounds as possible of marijuana on the first delivery. Robert Cooke advised that it would not be a problem for him to give CI2 $15000 to $20000 during the exchange. Robert Cooke further advised that he liked the idea of having a supplier close by to cut down on the risk of transporting large quantities of marijuana. He advised that a local supplier would also keep his partner from showing up at his house in the middle of the night when returning from Philadelphia or Connecticut.

28. After the conversation, Robert Cooke exited the vehicle and CI2 exited the area. Affiant Short then followed CI2 to a predetermined location where Affiant Short met with CI2. CI2 turned over to me the brown bag containing the cracker box. The cracker box contained marijuana. The cracker box contained 8 individually packaged bags of marijuana. The marijuana was field-tested with a #9 KN Reagent for Marijuana, THC, and Hashish and a positive reaction was obtained. Affiant Short again searched CI2 and found him/her to be free of drugs, money, and contraband.

29. On March 3, 2005, an Attorney General Subpoena was presented to David Smith with the Division of Revenue. The subpoena was a request for tax information pertaining to Robert Cooke. David Smith advised that Robert Cooke failed to file Delaware personal tax returns in 2001, however he filed returns in 2002 and 2003. On the filings he used the address of ███████████████, Dover, Delaware.

30. On March 3, 2005, an Attorney General Subpoena was presented to David Smith with the Division of Revenue. The subpoena was a request for tax information pertaining to Gwennette and Kenneth Bowman. David Smith advised that Gwennette and Kenneth Bowman failed to file Delaware personal tax returns in 2001, 2002, and 2003.

31. On March 3, 2005, an Attorney General Subpoena was presented to David Smith with the Division of Revenue. The subpoena was a request for tax and business license information pertaining to Teragwens Leather Toys and Lace, Ken's Underground Custom Tattoo, and Capitol Pizza. The records showed that Gwennette Bowman owns Teragwens Leather Toys and Lace and she has business licenses for the business located at 1044 South Dupont Highway, Dover, Delaware. Gwennette Bowman filed quarterly gross receipts tax forms and quarterly tax withholding tax forms. Kenneth Bowman has applied for a business license for Capitol Pizza located at 1030 C South Dupont Highway, Dover, Delaware and Ken's Underground Tattoo located at 1044 South Dupont Highway, Dover, Delaware.

32. On March 3, 2005, an Attorney General Subpoena was presented to David Smith with the Division of Revenue. The subpoena was a request for tax information

pertaining to The Dragon's Lair. David Smith advised that the Dragon's Lair is a partnership between Kenneth Bowman and Jennifer Layfield. Kenneth Bowman is 51% owner and Jennifer Layfield is a 49% owner in the business. The business is located at 106 Midway Village, Rehoboth Beach, Delaware.

33. On March 9, 2005, Affiant Short instructed CI2 to call Robert Cooke to see if he still wished to purchase ten pounds of marijuana from CI2. CI2 placed the call and Robert Cooke advised that he would be able to purchase the marijuana the following week.

34. ███████████████ Dover, Delaware is a single-story red brick residence. There is a stockade fence around the rear of the residence and an outbuilding in the rear of the residence. The residence sits on the west side of South State Street and the number 2306 is on the end of the driveway.

35. ███████████████ Harrington, Delaware is a two-story residence cream with cream colored siding and a dark colored roof and shutters. There is a detached three-car garage on the end of the driveway and an outbuilding in the rear yard. The residence sits on the south side of Paradise Alley Road and is approximately a mile north of Carpenter Bridge Road.

36. ███████████████, Camelot Meadows Mobile Home Park. The residence is a light grey singlewide mobile home with a screened in porch. The residence sits on the west side of Palace Road in Camelot Meadows Mobile Home Park.

37. Teragwens Leather Toys and Lace and Ken's Underground Tattoo are stores in a strip mall. The names of the business are on a sign over the front door of the business. The strip mall address is 1044 South DuPont Highway, Dover, Delaware 19901. Since visual inspection shows that Ken's Underground Tattoo does not appear to sell drug paraphernalia, the search warrant is limited to Teragwens Leather Toys and Lace.

38. The Dragon's Lair is at 106 Midway Village, Rehoboth Beach, Delaware. The business has a sign with Dragon's Lair on the roof and is a red brick building.

39. Based upon your affiant's training, experience and participation in past drug investigations, your affiant knows:
    A. That drug traffickers very often place their assets in names other than their own to avoid detection of these assets by government agencies and even though these assets are in the names of others, the drug trafficker actually owns and continues to use these assets and exercise dominion and control over them.
    B. That drug traffickers must maintain large amounts of United States currency in order to maintain and finance their on going narcotic business;
    C. That drug traffickers maintain books, ledgers, records, receipts, notes, money

      orders and other papers relating to the transportation, ordering, purchasing and distribution of drugs;

D. That it is common for drug traffickers to secrete contraband, proceeds of drug sales and records of transactions in secure locations within their residence and/or their business for their ready access and to conceal their existence from law enforcement officers.

E. That when drug traffickers amass large proceeds from the sale of drugs the traffickers attempt to legitimatize these profits. To do so, the drug traffickers often utilize domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, real estate and business fronts;

F. That drug traffiekers commonly maintain addresses or telephone numbers in books of paper which reflect names, addresses and/or phone numbers of their associates in the drug trafficking organization;

G. That drug traffickers often take payment in the form of stolen items such as televisions, stereos, VCR's, guns and cameras and/or that they obtain these items legitimately with the profits of drug sales. These items, found in quantities of more than two, which is not common for a residence, are evidence of a drug dealer's profits;

H. Your affiant is aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

I. Your affiant can state that the drug trafficker will generally only transport that amount of drug needed to complete a specific transaction. The drug trafficker will maintain the balance of the supply at a secure location, usually at their residence.

40. Based upon the information contained herein, it is the belief of your affiant that probable cause does exist to believe that marijuana, paraphernalia, monies, drug records, and other evidence relating to the distribution of controlled drugs, as more fully described in the relevant Attachment Bs, can be found in the residences of Robert Cooke ( ███████████, Dover, Delaware), Gwennette Bowman ███████████, Harrington, Delaware), and Jason Esham ███████████ Camelot Meadows Mobile Home Park, Rehoboth Beach, Delaware).

41. Federal law states that, "All conveyances, including ... vehicles ..., which are used ... to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [controlled substances]" shall be subject to forfeiture. 21 U.S.C. § 881(a)(4). Based on the information contained in this affidavit, there is probable cause to believe that the following vehicles have been used to transport marijuana, and are therefore subject to forfeiture: -- a 2003 Jeep Cherokee, DE registration 27251 (see paragraphs 15 and 16); -- a 2000 Pontiac Grand Am, DE registration 441163 (see paragraph 17); and -- a 2004 Jeep Cherokee, DE registration PC305313 (see paragraphs 19 and 26).

42. Based upon my experience, as well as discussions with other knowledgeable law enforcement officers, I know that a vehicle of considerable value, such as the vehicle that is the subject of this affidavit, can be easily disposed of, or if damaged, will lose considerable value. Therefore, a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture.

43. On March 5, 2005, Detective Mary McGuire of the Delaware State Police Special Investigations Unit went into the Dragon's Lair store at 106 Midway Village, Rehoboth Beach, Delaware. Detective McGuire is an experienced narcotics officer with the Delaware State Police and has attended both state and federal training courses involving dangerous drugs. Detective McGuire entered the store and walked into a room to the left of the entrance door. In the room, Detective McGuire observed numerous articles of drug paraphernalia. Detective McGuire observes metal, wooden, plastic, and glass pipes in different shapes and sizes. There were metal bowls and water bongs. From Detective McGuire's experience the items observed are for the use of marijuana and other controlled substances. The items observed and like items are commonly seized during illegal drug investigations as a means to inhale marijuana. On March 12, 2005, Detective McGuire went into Teragwen's Leather Toys and Lace at 1044 South Dupont Highway, Dover, Delaware. Detective McGuire entered the store and walked through a clothing section in the store. Detective McGuire then went into a room to the left and observed numerous articles of drug paraphernalia. Detective McGuire observes metal, wooden, plastic, and glass pipes in different shapes and sizes. There were metal bowls and water bongs. From Detective McGuire's experience the items observed are for the use of marijuana and other controlled substances. The items observed and like items are commonly seized during illegal drug investigations as a means to inhale marijuana.

46. Federal law states that, "It is unlawful for any person . . . to sell or offer for sale drug paraphernalia." 21 U.S.C. § 863(a). That law defines "drug paraphernalia" to mean "any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance. . . . It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hashish oil, PCP, or amphetamines into the human body, such as --
    (1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
    (2) water pipes;
    (3) carburetion tubes and devices;
    (4) smoking and carburetion masks;
    (5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;
    (6) miniature spoons with level capacities of one-tenth cubic centimeter or

less;
    (7) chamber pipes;
    (8) carburetor pipes;
    (9) electric pipes;
    (10) air-driven pipes;
    (11) chillums;
    (12) bongs;
    (13) ice pipes or chillers;
    (14) wired cigarette papers; or
    (15) cocaine freebase kits."

47. Based on my experience, as well as that of Detective McGuire, there is drug paraphernalia offered for sale at The Dragon's Lair and Terragwens Leather Toys and Lace. Further, based on my experience and training, as well as common sense, businesses such as The Dragon's Lair and Terragwens Leather Toys and Lace are likely to have at the business locations certain kinds of business records that are relevant to determining knowledge and control in relation to the drug paraphernalia offered for sale. These records would include bank account statements and checks for the year 2005, which would show who is in financial control of the business and who is profiting from the business, and invoices or purchase orders from the year 2005 relating to the obtaining of the drug paraphernalia.

48. Based upon the information contained herein, it is the belief of your affiant that probable cause does exist to believe that The Dragon's Lair and Terragwens Leather Toys and Lace sell drug paraphernalia, in violation of federal law, and that items of drug paraphernalia, as well as records that indicate the ownership of the businesses will be located at the businesses, as more fully set forth in the relevant Attachment Bs, can be found at Terragwens Leather Toys and Lace located at 1044 South DuPont Highway, Dover, Delaware, and at the Dragon's Lair, 106 Midway Village, Rehoboth Beach, Delaware.

Det. Darren Short
Del. State Police

Sworn to and subscribed before me this 15th day of March, 2005.

Honorable Mary Pat Thynge
United States Magistrate Judge
District of Delaware

Attachment B

**Property to be seized:**

████████████████████ Dover, Delaware)

1. Any marijuana.

2. Any related drug paraphernalia. Drug paraphernalia shall include materials of any kind which are used, intended for use or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, re-packaging, storing, containing, or concealing controlled substances, and for injecting, ingesting, inhaling or otherwise introducing controlled substances into the human body.

3. Indicia of occupancy or residency of the described residence including but not limited to utility and electric bills, cancelled envelopes, and keys.

4. Books, records, receipts, notes, ledgers and other papers relating to transporting, ordering, purchasing or distributing marijuana or its by-products including addresses and telephone numbers of individuals associated in the drug trafficking operation.

5. Any documents, receipts, tickets or other papers reflecting or evidencing travel by any means in furtherance of the drug trafficking enterprise between Delaware and Pennsylvania or Connecticut.

6. Books, records, receipts, bank statements and records, money drafts, letters of credit, cashier's check receipts, passbooks, bank checks, safety deposit keys, loan documents, wire transfers and other papers or documents evidencing the obtaining, secreting, transferring, laundering and investing and/or concealing of any assets or monies obtained directly or indirectly from violations of the controlled substance laws.

7. Any United States currency in close proximity to any marijuana or paraphernalia, or any quantities of currency in excess of $500.00, or other property such as VCRS, televisions, cameras and stereos of estimated value of more than $100.00 found in quantities not normally associated with residences.

8. Any firearm or deadly weapon in close proximity to marijuana or any other controlled substance.

Attachment B

**Property to be seized:**
 Harrington, Delaware)

1. Any marijuana.

2. Any related drug paraphernalia. Drug paraphernalia shall include materials of any kind which are used, intended for use or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, re-packaging, storing, containing, or concealing controlled substances, and for injecting, ingesting, inhaling or otherwise introducing controlled substances into the human body.

3. Indicia of occupancy or residency of the described residence including but not limited to utility and electric bills, cancelled envelopes, and keys.

4. Books, records, receipts, notes, ledgers and other papers relating to transporting, ordering, purchasing or distributing marijuana or its by-products including addresses and telephone numbers of individuals associated in the drug trafficking operation.

5. Books, records, receipts, bank statements and records, money drafts, letters of credit, cashier's check receipts, passbooks, bank checks, safety deposit keys, loan documents, wire transfers and other papers or documents evidencing the obtaining, secreting, transferring, laundering and investing and/or concealing of any assets or monies obtained directly or indirectly from violations of the controlled substance laws.

6. Any United States currency in close proximity to any marijuana or paraphernalia, or any quantities of currency in excess of $500.00, or other property such as VCRS, televisions, cameras and stereos of estimated value of more than $100.00 found in quantities not normally associated with residences.

7. Any firearm or deadly weapon in close proximity to marijuana or any other controlled substance.

Attachment B

**Property to be seized:**

Camelot Meadows Mobile Home Park, Rehoboth Beach, Delaware)

1. Any marijuana.

2. Any related drug paraphernalia. Drug paraphernalia shall include materials of any kind which are used, intended for use or designed for use, in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, re-packaging, storing, containing, or concealing controlled substances, and for injecting, ingesting, inhaling or otherwise introducing controlled substances into the human body.

3. Indicia of occupancy or residency of the described residence including but not limited to utility and electric bills, cancelled envelopes, and keys.

4. Books, records, receipts, notes, ledgers and other papers relating to transporting, ordering, purchasing or distributing marijuana or its by-products including addresses and telephone numbers of individuals associated in the drug trafficking operation.

5. Books, records, receipts, bank statements and records, money drafts, letters of credit, cashier's check receipts, passbooks, bank checks, safety deposit keys, loan documents, wire transfers and other papers or documents evidencing the obtaining, secreting, transferring, laundering and investing and/or concealing of any assets or monies obtained directly or indirectly from violations of the controlled substance laws.

6. Any United States currency in close proximity to any marijuana or paraphernalia, or any quantities of currency in excess of $500.00, or other property such as VCRS, televisions, cameras and stereos of estimated value of more than $100.00 found in quantities not normally associated with residences.

7. Any firearm or deadly weapon in close proximity to marijuana or any other controlled substance.

Attachment B

**Property to be seized:**
(The Dragon's Lair, 106 Midway Village, Rehoboth Beach, DE)

1. Indicia of occupancy or residency of the described business including but not limited to utility and electric bills, cancelled envelopes, and keys.

2. Any drug paraphernalia, specifically –

1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
(2) water pipes;
(3) carburetion tubes and devices;
(4) smoking and carburetion masks;
(5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;
(6) miniature spoons with level capacities of one-tenth cubic centimeter or less;
(7) chamber pipes;
(8) carburetor pipes;
(9) electric pipes;
(10) air-driven pipes;
(11) chillums;
(12) bongs;
(13) ice pipes or chillers;
(14) wired cigarette papers; or
(15) cocaine freebase kits.

3. Books, records, receipts, notes, ledgers and any other financial records, including bank statements and checks, relating to the year 2005, which show an ownership or operational interest in the business.

4. Any invoices or purchase orders relating to the purchase of drug paraphernalia in the year 2005.

Attachment B

**Property to be seized:**
(Teragwen's Leather Toys and Lace, 1044 South DuPont Highway, Dover, DE)

1. Indicia of occupancy or residency of the described business including but not limited to utility and electric bills, cancelled envelopes, and keys.

2. Any drug paraphernalia, specifically –

1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls;
(2) water pipes;
(3) carburetion tubes and devices;
(4) smoking and carburetion masks;
(5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand;
(6) miniature spoons with level capacities of one-tenth cubic centimeter or less;
(7) chamber pipes;
(8) carburetor pipes;
(9) electric pipes;
(10) air-driven pipes;
(11) chillums;
(12) bongs;
(13) ice pipes or chillers;
(14) wired cigarette papers; or
(15) cocaine freebase kits.

3. Books, records, receipts, notes, ledgers and any other financial records, including bank statements and checks, relating to the year 2005, which show an ownership or operational interest in the business.

4. Any invoices or purchase orders relating to the purchase of drug paraphernalia in the year 2005.